# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILLIAM TISDALE | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 22-237 |
| | * | |
| MARQUETTE TRANSPORTATION CO. | * | JUDGE GUIDRY |
| OFFSHORE, LLC, ET AL. | * | |
| | * | MAGISTRATE JUDGE NORTH |

*********************************************

<u>RESPONSE TO MOTION FOR SUMMARY JUDGMENT</u>

**MAY IT PLEASE THE COURT:**

William Tisdale ("Tisdale"), the Plaintiff in this civil action, respectfully submits this response to the August 2, 2023 Motion for Summary Judgment submitted by the Defendant, Marquette Transportation Company Gulf-Inland, LLC ("Marquette").[1]  As will be shown in this response memorandum, there remain numerous genuine issues of material fact which cannot be resolved without a trial on the merits.  Accordingly, Marquette's motion should be denied.

## I.  MATERIAL FACTS LEARNED DURING PRIOR DISCOVERY

This civil action presents a negligence claim under the Jones Act and a seaworthiness claim under the General Maritime Law.  It had its origin in an accident and injury to Mr. Tisdale which occurred on March 13, 2019.[2]  At that time, Mr. Tisdale was employed as a steersman by Marquette,[3]

---

[1] See Rec. Doc. 131.

[2] See Rec. Doc. 129 at p. 9.

[3] See Rec. Doc. 131-1 at p. 2, ¶¶ 1-3.

which owned and operated the M/V/ ST. JOHN, the vessel to which Mr. Tisdale was then assigned.[4]

Neither Mr. Tisdale's Jones Act seaman status nor the fact of his injury is contested.

The Master of the vessel, Captain Greenhouse, described Mr. Tisdale crew status as a "covered" steersman:

> Q.     All right. And he was a covered steersman, right? You testified he was a covered steersman. Is that true?
>
> A.     He was considered a covered steersman. That's true.[5]

Marquette summary judgment argument is that *"Tisdale's theory of fault has nothing to do with whether he was provided a safe place to work, whether the task he was assigned was unreasonably dangerous, or whether he was provided the tools, equipment and manpower to perform the job safely."*[6]  This argument disregards critical material facts learned during discovery and ignores <u>those exact allegations</u> in sub-parts f-h of Paragraph IX of the original Complaint:

> f.     ***Exposing the Plaintiff to unreasonable risk of injury and harm*** while serving aboard the vessel;
>
> g.     ***Not providing Plaintiff with enough equipment, assistance, and manpower to do the tasks assigned***;
>
> h.     ***Failure to warn Plaintiff of dangers and needlessly exposing Plaintiff to non-apparent dangers***;[7]

(Bold emphasis by Mr. Tisdale.)

Marquette further claims that *"Tisdale admitted there was nothing unsafe about his*

---

[4]Id., at p. 2, ¶ 3.

[5]See Exhibit 1 at p. 72.

[6]See Rec. Doc. 131-1 at p. 7.

[7]See Rec. Doc. 1 at p. 5.

*workplace, the task, the equipment or the manpower to do this one-man job."*[8] This statement must be placed in context.  While the general task of moving rigging might well be reasonably safe if, *e.g.*, the work area is on the almost level decks of two breasted barges, discovery has revealed that Mr. Tisdale was instructed by the vessel's pilot to remove and carry a wet line the pilot knew weighed more than 100 pounds.  The pilot was responsible for Tisdale's safety, and presumably was trained with regard to Marquette's *70 pound lifting limit* for deck hands.[9]  Here, before the two breasted barges were separated, the on-duty deck hand negligently left the heavy line atop a barge hatch cover instead of moving it to the bow of barge MTC-1363.  The pilot failed to intervene.  The result was separation of the breasted barges, loss of a safe six foot wide "alley" create by their adjacent decks, and a 100+ pound unwieldy line hanging at Mr. Tisdale's shoulder height.  This height was *at or above Marquette's 60 inch height lifting limit*, preventing Mr. Tisdale (or anyone else) from using a safe lifting technique.  As a result, Mr. Tisdale was forced to undertake this unsafe task while standing on the two-foot wide, wet starboard deck of MTC-1363 with open water at his back.

It is critical for the Court to understand that there is no testimony whatsoever that any of the "20 lines" Captain Greenhouse asked Mr. Tisdale to move exceeded Marquette's 70 pound weight lifting limit, or that any had to be lifted above Marquette's 60-inch height lifting limit.  There is no testimony that any of this other rigging was located in a precarious position where safe lifting techniques could not be used.  Thus, Marquette's comment *"there was nothing unsafe about his workplace, the task, the equipment or the manpower to do this one-man job"* might generally describe removal of this other rigging but not the specific problems with removing the lock line.

---

[8]Id.

[9]See Exhibit 2, "Deckhand Duties, Responsibilities and Physical Demand of the Job."

There is no testimony suggesting that Mr. Tisdale attempted to lift the lock line in an unsafe manner. In fact, Pilot Williams testified that Tisdale lifted the line "normally," "the way he would have lifted it himself," and the manner in which he lifted it "did not cause him any cause for concern."[10]

Marquette, despite the allegations of Paragraph IX of the Complaint, attempts to limit Mr. Tisdale's claims to *".... because Marquette allowed him into the Steersman Program and had treated him as a 'covered steersman' at times, it owed him an unspecified legal duty to never ask him to perform deck work."[11]* Marquette claims this "covered steersman" argument is *"Tisdale's only theory of liability in this case – i.e., he contends he should have been a covered steersman, and should not have been asked to perform the work of a deckhand...."[12]*

Whether Mr. Tisdale was exempt from deck work on March 13, 2019 is an entirely separate matter from the circumstances of his injury. Regardless of his status, the vessel's captain *generally ordered* Mr. Tisdale to participate in the task of moving rigging to the bow of MTC-1363. Mr. Tisdale testified:

> A.   "Captain Greenhouse said, William, they're not sending a deckhand out from the office. You're going to have to go down there and deck and help Jarvis get up all the rigging. I mean, there's 20 lines down there, easily."[13]

After Mr. Tisdale boarded MTC-1363, Pilot Jody Williams *specifically ordered* him to remove the saturated lock line from the starboard side of MTC-1363. Mr. Tisdale attempted to

---

[10]See Exhibit 6 at pp. 54-55.

[11]Id.

[12]Id., at p. 8.

[13]See Exhibit 6 at p. 91.

comply with this order and was severely injured.

This response, and Mr. Tisdale's July 8, 2023 "Motion for Leave to File Amended Complaint for Damages,"[14] both feature critical material facts learned months *after* the original Complaint[15] was filed and the first Scheduling Order's May 27, 2022 amendment deadline had expired.[16]  These facts reveal far more than just a "covered steersman" issue.  Indeed, these facts contradict Marquette witnesses and opinions by its maritime expert.  Genuine issues of material fact exist regarding how negligence created an unseaworthy condition which was the direct cause of Mr. Tisdale's injury.

On March 13, 2019, the M/V ST. JOHN  pushed a flotilla of six barges rigged in port and starboard columns of three barges each.  The position of each barge was recorded on the Daily Boat Log's Tow Diagram[17] as follows:

```
STARBOARD        <CHEM-269B <CH-0133    <MTC-661B
                 ---------------------------------------------- < M/V ST. JOHN
PORT             <CH-0956    <MTC-1363  <LTD-7391B
```

Between 12:45 hours and 13:10 hours, barges CH-0133 and MTC-661B were dropped off.  Prior to barge CH-0133's drop-off, it was "breasted" to the starboard side of MTC-1363.  This created a five to six foot wide "alley way" running the length of the barges that was "walled" on the left and right by the barges' vertical cargo coamings.  The two barges, prior to CH-0133's drop-off, were connected by wire rigging at bow and stern, and also by a fabric "lock line" amidship.

Weather conditions were bad.  It has been "pouring down" rain that day, the barge deck was

---

[14]See Exhibit 3 (Rec. Doc. 133-10).

[15]See Rec. Doc. 1.

[16]See Rec. Doc. 20.

[17]See Exhibit 4.

wet, and the rain-soaked lock line weighing over 100 pounds.[18]  This lock line hanged approximately at shoulder height for the 6-foot three-inch tall Mr. Tisdale, and was at or above Marquette's height lift limit of 60 inches.  It had to be further lifted-up vertically by Mr. Tisdale for it to clear the cargo hatch fitting from which it hung.[19]

This lock line was part of the M/V ST. JOHN'S working rigging, so one of the tasks precedent to separating the two barges was untying the lock line connecting them amidships and returning it to the vessel.[20]  Because the CH-0133 was being dropped-off first, the lock line was brought aboard the MTC-1363 for subsequent removal to the M/V ST. JOHN.

It has been raining and both the pilot[21] on duty knew this saturated fabric line weighed more than 100 pounds.   He also knew, or should have known that Marquette's corporate safety policy limited lifting to 70 pounds up to a height of 60 inches.[22]  He also knew that lifting it was a "two-man job."[23]

Instead of dragging the heavy, wet lock line to the rake bow of the MTC-1363 when it was breasted to the H-0133, the on-duty deck hand negligently hanged and left it amidship on a starboard-side hatch cover fitting.  The  pilot then negligently failed to intervene and order the lock line moved to bow of the MTC-1363 while the CH-0133 was still breasted position and the safe

---

[18]See Exhibit 5 at pp. 201-202.

[19]See Exhibit 6 at p. 53.

[20]See Exhibit 7 at p. 44.

[21]See id., at p. 110.

[22]See Exhibit 2.

[23]See Exhibit 7 at p. 110.

"alley way" existed.  As a consequence of the pilot's failure to promptly correct this problem, an unseaworthy condition was created when the CH-0133 was removed from the flotilla.  The 100+ pound wet lock line already hanged awkwardly at shoulder height and now it was above open water.

After this first drop-off, the flotilla was now comprised of four remaining barges:

STARBOARD        <CHEM-269B
                              -------------------------------------------------- < M/V ST. JOHN
PORT                   <CH-0956     <MTC-1363   <LTD-7391B

The dropping-off of CH-0133 and MTC-6661B was recorded in the Daily Boat Log.[24]  This occurred *four hours before Mr. Tisdale's accident*.  Between 14:25 hours and 14:30 hours, the remaining barge of the starboard column, CHEM-269B, was dropped off.  This was recorded in the Daily Boat Log.[25]  Mr. Tisdale was still "driving the boat."[26]  The flotilla was now comprised of the port side string of three barges:

<CH-0956      <MTC-1363   <LTD-7391B <M/V ST. JOHN

At this time, each of the three remaining barges had open water off their port and starboard sides.  When the M/V ST. JOHN arrived at the Kirby-Greens Bayou facility, the MTC-1363 was "tied-up"[27] on her port side.  This allowed the M/V ST. JOHN to drop off the barges CH-0956 and LTD-7391B.  This was recorded in the  Daily Boat Log.[28]  At the time of Mr. Tisdale's accident, the MTC-1363 and the M/V ST. JOHN were made-up bow-to-bow to facilitate transfer of the rigging

---

[24]See Exhibit 4.

[25]See id.

[26]See Exhibit 6 at p. 51.

[27]See Exhibit 7 at p. 55.

[28]See Exhibit 4.

from the rake bow of MTC-1363 to the vessel.  Mr. Tisdale stood amidship on the starboard side of

the MTC-1363, facing the barge's bow and the bow of the faced-up M/V ST. JOHN.[29]

For a precise chronology of the events, including when all barges were dropped-off and Mr.

Tisdale's location at those times, see his attached Declaration.[30]

The pilot, Mr. Jody Williams, was deposed on April 29, 2022, over three years post-accident.

No doubt he had seen thousands of barges and hundreds of flotillas in those intervening years.  He

testified that when Mr. Tisdale had his accident, the MTC-1363 and CH-0133 were still breasted

together, with a four-inch difference in respective deck height:

> A.     "So when William picked up the line or was in the process of picking
> up the line, he was going to pick it up, you know, and step back.  But
> he didn't have a whole lot of room behind him *because the barges
> were two different heights*."
>
> *       *       *
>
> Q.     "Okay.  *So in this case, we have one barge that's three or four
> inches taller than the other barge.*"
>
> A.     *"This is correct"* [31]

Mr. Williams *mis-remembered* the facts.  When asked to draw the tow flotilla, Mr. Williams

drew *a picture of four-barges* and placed Mr. Tisdale at the stern end of an "alley way" between the

aft two breasted barges.   The M/V ST. JOHN was depicted as "faced-up" down the flotilla

centerline.[32]  This erroneous testimony and drawing led to several critical misunderstandings of the

---

[29]See Exhibit 8.

[30]See Exhibit 11.

[31]See Exhibit 7 at pp. 47-48.

[32]See Exhibit 9.

actual facts by Marquette's maritime expert, Captain Ron Campana.  For example, he opined that:

> "The deck width between the barge coaming and deck edge on a cargo hopper barge is 3'-03". I have taken these measurement thousands of times as a surveyor when performing barge draft surveys. ***Additionally, there was another barge alongside the MTC barge. Mr. Tisdale had no chance of falling into the water and since he was on the aft starboard side of the barge and a short distance to the tug, there was no reason whatsoever to transfer the line to his other shoulder.*** Mr. Tisdale testified he was walking up the starboard side towards the line. ***If he wanted to pick the line up so that it would be on his left shoulder as he walked back to the tug, all he had to do was pick it up with his left shoulder by facing the line, placing it on his left shoulder and then turn around and walk aft.*** There was absolutely no reason to transfer the line from one shoulder to another. Captain Greenhouse testified all he had to do to switch shoulders is put the line back on the clamp hook and repick it up with the other shoulder."[33]

(Bold emphasis by Mr. Tisdale.)

There was <u>not</u> another barge breasted alongside MTC-1363 when Mr. Tisdale had his accident!  There was no remaining four barge flotilla at that time because all three barges in the starboard column *had already been dropped-off hours earlier.*[34]  The Daily Boat Log produced by Marquette contains a flotilla diagram which shows the error of the Williams drawing.[35]  Before any barges were dropped off on March 13, 2018, the MTC-1363 and CH-0133 were the *middle* barges in the three-barge port and starboard columns,[36] yet Williams' drawing has Mr. Tisdale standing on the starboard side of the *aft* barge in a two barge column.

Before Mr. Tisdale's accident, when the MTC-1363 and the CH-013 were breasted together, the flotilla looked like this:

---

[33]See Exhibit 10 at p. 5.

[34]See Exhibit 4.

[35]Id.

[36]Id.

```
STARBOARD        <CHEM-269B <CH-0133    <MTC-661B
                 -------------------------------------------- < M/V ST. JOHN
PORT             <CH-0956     <MTC-1363  <LTD-7391B
```

Between 12:45 hours and 13:10 hours, barges CH-0133 and MTC-661B were dropped off. This means it was *impossible* at 16:45 hours, when Mr. Tisdale had his accident, that these barges were still breasted together, or that their adjacent decks were within a four inch height of each other, or that a six foot wide protected  "alley way" deck existed between them.

Captain Campana completely *misunderstood* these facts.  The two barges weren't breasted together when Mr. Tisdale had his accident, and the starboard side of MTC-1363 was exposed to open water.   The MTC-1363 and the  M/V ST. JOHN were now made-up bow-to-bow to ease transfer of the rigging from the rake bow of the barge to the forward area of the vessel.  Mr. Tisdale's drawing of the configuration of the flotilla at the time of his injury shows this.[37] Their configuration at that time was as follows:

**MTC-1363> <M/V ST. JOHN**

Mr. Tisdale's drawing makes it clear that *he was amidship on the starboard side of the MTC-1363 when his accident occurred, above open water.*  Because he was about to carry the lock line forward on the starboard side of the barge, his outboard shoulder was his *right* shoulder.  Because Captain Campana is factually mistaken about the final flotilla configuration (*i.e.*, no breasted barges with a four-inch difference in deck heights, no "alleyway) and is apparently unaware of the bow-to-bow positions of the MTC-1363 and the M/V ST. JOHN, his Conclusions and Opinions are fatally flawed.  He opined:

---

[37]See Exhibit 8.

*"The distance between the coaming and deck edge of the barge is 3'-03". There were two barges side by side with an apparent 4" height difference. The free space to operate was effectively 6'-06" and a 4" height differential is a minor inconvenience easily navigated by an experienced man such as Mr. Tisdale.* Mr. Tisdale had no reason to swap shoulders with the lock line. *No matter what position he was when walking to the line, all he had to do was face the tug, pick up the line onto his should, and walk back to the tug."*[38]

The foregoing excerpt from Marquette's maritime expert's report illustrates the unresolved genuine issues of material fact existing in this case. If Captain Campana were correct, and two barges were indeed breasted at 16:45 hours when Mr. Tisdale had his accident, then the causation equation would have tilted in Marquette's favor. On the other hand, because Marquette's own Daily Boat Log[39] correctly memorialized when each of the six barges was dropped-off, they only support Mr. Tisdale's version of the facts. As such, they support his Jones Act negligence and General Maritime Law seaworthiness claims.[40] This dichotomy in the two sides' versions of the relevant material facts presents a genuine dispute which should be resolved in a jury trial.

## II. LEGAL STANDARDS

### A. Summary Judgment.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[41] "Rule 56(c)

---

[38]See Exhibit 10 at p. 11.

[39]See Exhibit 4.

[40]For a cogent, short explanation of Marquette's creation of a dangerous work environment which was a cause of Mr. Tisdale's injury, see the Declaration of Captain Larry Strouse attached as Exhibit 12.

[41]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."[42] A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.[43] If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.[44]

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.[45] "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment.[46] In ruling on a summary judgment motion, however, a court may not resolve credibility issues or weigh evidence.[47] Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.[48]

---

[42]Id.

[43]Id. at 323.

[44]Id. at 324.

[45]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996).

[46]*Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Anderson*, 477 U.S. at 249-50.

[47]*Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

[48]*Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

**B.     The Jones Act.**

Under the Jones Act, 46 U.S.C. § 30104, Marquette is liable for damages if its negligence caused Mr. Tisdale's injury, in whole or in part.[49]  Marquette had the duty to provide him with a reasonably safe place to work.[50]  The duty to provide a reasonably safe workplace is broad in scope, but it is not a form of strict liability; like common law negligence, ordinary prudence under the circumstances is the standard for the duty of care owed by an employer to a seaman.[51] Marquette breached that duty because it failed to exercise ordinary prudence and is thereby negligent.[52]  If its negligence played a part, however slight, in causing Mr. Tisdale's injury, then his Jones Act employer, Marquette, owes him damages for its negligence.[53]

For his part, Mr. Tisdale is held to the standard of the reasonable seaman in like circumstances.[54] And the causation standard is the same for both the employer's negligence and contributory negligence: causation is established if the party's "negligence played any part, even the slightest, in producing the injury."[55] However, more than mere "but for" causation must be established; the negligence must be a legal cause of the injury.[56]

---

[49]*Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997)(*en banc*).

[50]*Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989).

[51]*Gautreaux*, 107 F.3d at 335-36.

[52]Id. at 339.

[53]Id.

[54]Id.

[55]*Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 945, 947 (5th Cir. 2012) (quoting *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 303 (5th Cir. 2008)).

[56]*Johnson,* 544 F.3d at 3.

C.    **Unseaworthiness.**

Independent from his Jones Act claim, Mr. Tisdale has a claim for injuries caused by the unseaworthiness of Marquette's barge MTC-1362 under the general maritime law. Marquette had an absolute non-delegable duty to provide Mr. Tisdale with a seaworthy vessel; the duty imposes liability without fault.[57] A ship is seaworthy if the vessel, including her equipment and crew, is reasonably fit and safe for the purposes for which it was intended to be used.[58] "Unseaworthiness is a condition, and how that condition came into being - whether by negligence or otherwise - is quite irrelevant to the owner's liability for personal injuries resulting from it."[59]

The general maritime law ordinarily treats an "appurtenance" attached to a vessel in navigable waters as part of the vessel itself.[60] The lock line was an "appurtenance" of the MTC-1363 because components of a vessel, even though readily removable, which are essential either for her general navigation or for the specific voyage upon which she is embarked, become a part of the vessel itself and thus constitute appurtenances or apparel of the vessel.[61] Louisiana state courts have addressed this issue too, holding as a matter of law that an accessory or appurtenance to the vessel

---

[57]*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 548-49 (1960).

[58]*Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002); *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339 (1955)("The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service.").

[59]*Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498 (1971).

[60]*Jerome B. Grubart v. Great Lakes Dredge & Dock*, 513 U.S. 527 (1995); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 808 F.Supp.2d 943 (E.D. La., 2011).

[61]*Stewart & Stevenson Services, Inc. v. M/V CHRIS WAY MACMILLAN*, 890 F. Supp. 552, 561-64 (N.D. Miss. 1995).

is treated as part of the vessel.[62]   The words "used in conjunction with the primary function of the vessel" should be broadly construed.[63]

Marquette had a non-delegable duty to provide Mr. Tisdale with a seaworthy vessel.  This includes appurtenances reasonably fit for their intended use.[64]   A vessel is unseaworthy unless all of its appurtenances are reasonably fit and safe for their intended purposes.[65]

Unseaworthiness is not a fault-based standard; however, a plaintiff must show that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[66] A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper.[67]

A vessel is also unseaworthy when an unsafe method of work is used to perform vessel

---

[62]*Bell v. Dunn*, 924 So.2d 224 (La. App. 4th Cir. 2005)

[63]*Parks v. Pine Bluff Sand & Gravel Co.*, 712 So.2d 905 (La. App. 3 Cir., 1998), relying on *Fox v. Taylor Diving and Salvage Co.*, 694 F.2d 1349 (5th Cir.1983).

[64]*Italia Societa per Azioni Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315 (1964); *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325 (1960);  *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186 (5th Cir. 1991).

[65]*Phillips v. Western Co. of North America*, 953 F.2d 923 (5th Cir.1992); *Foster v. Destin Trading Corp*., 700 So.2d 199 (La. 1997)*; and Griffin v. LeCompte*, 471 So.2d 1382 (La.1985).

[66]*Phillips,* 953 F.2d at 928.

[67]*Usner*, 400 U.S. at 499); *Webb v. Dresser Indus*., 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied* 429 U.S. 1121 (1977).

services.[68] Still, "an isolated personal negligent act of the crew" is not enough to render a ship unseaworthy.[69] Rather, there should be evidence of "a congeries of acts."[70]

### III. RESPONSE TO MARQUETTE

**A.     The Jones Act.**

In *Underwood*,[71] the late Judge Martin Feldman granted summary judgment in a combined Jones Act and unseaworthiness claim featuring very different facts.[72]  There, the 57-pound pump carried by the plaintiff was well within his job description which required the ability to lift and carry 80 pounds.[73]  Mr. Tisdale's job description featured a 75-pound lifting limit and he was ordered to carry a line known to weigh over 100 pounds.  Another critical distinction was that Mr. Underwood could have but did not employ safe lifting techniques[74] whereas Mr. Tisdale was unable to "lift with his legs" due to the lock line hanging at his shoulder level.

---

[68]*Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972).

[69]*Daughdrill v. Ocean Drilling & Exploration Co.,* 709 F. Supp. 710, 712 (E.D. La. 1989).

[70]Id., quoting *Robinson v. Showa Kaiun K.K.*, 451 F.2d 688, 690 (5th Cir. 1971).

[71]*Underwood v. Parker Towing Co.*, 2021 WL 3077367 (E.D. La. July 21, 2021), *aff'd* 2022 WL 1553527 (5th Cir. May 15, 2022).

[72]*Underwood* involved a 57-pound gas-powered water pump which the plaintiff had carried to a barge, set down, then lifted again to place it on top of a bucket; a one-man task, all without incident. He claimed his injury occurred when he was removing the pump from on top of the two foot-tall bucket, after completing the routine task  of pumping water from the cargo hold of a barge.  See id., at p. 1.

[73]Id., at p. 3.

[74]Id., at p. 7 ("lift with the legs and maintain a straight back").

Judge Feldman's opinion set forth succinctly Mr. Underwood's Jones Act burden of proof as follows:

> ***To succeed on his Jones Act claim, Mr. Underwood must prove that Parker Towing's breached its duty to ensure a reasonably safe workplace and that this breach caused his back injury; he must present some evidence from which the fact finder can infer an unsafe work method*** (here, the alleged unsafe method of single-handedly lifting and maneuvering the three-inch pump to remove it from a bucket) ***and that Parker Towing knew or should have known of the danger presented by its work environment or work method***. Parker Towing seeks judgment as a matter of law on the ground that it is not liable for plaintiff's alleged back injury because he has failed to present any competent evidence to demonstrate that Parker Towing breached its duty to provide a reasonably safe work environment. The Court agrees.[75]

Put simply, ***to prevail in a Jones Act negligence claim:***

> > ***the plaintiff must present some evidence from which the fact finder can infer that an unsafe condition existed and that the vessel owner either knew, or in the exercise of due care should have known, of the condition.***[76]

(Bold emphasis by Mr. Tisdale.)

Here, Mr. Tisdale cites documents and testimony showing how the negligence of the deck hand and pilot created an unsafe condition which existed (a) after the deck hand hanged the heavy wet lock line at shoulder height on the hatch cover fitting and (b) the pilot failed to correct this situation before the previously breasted barges MTC-1363 and CH-0133 were separated leaving a wet two foot deck and open water under the hanging line.  The deck hand and pilot each knew about the excess weight of the lock line and its awkward position over open water.  Seen in a light most favorable to Mr. Tisdale, these material facts require denial of Marquette's motion.

**B.    General Maritime Law unseaworthiness.**

---

[75]Id., at pp. 12-13.

[76]Id., at p. 13.

Independent from a claim under the Jones Act, a seaman has a claim for injuries caused by the unseaworthiness of a vessel under the general maritime law. The duty of a vessel owner to provide a seaworthy vessel is an absolute nondelegable duty; the duty imposes liability without fault.[77] A ship is seaworthy if the vessel, including her equipment and crew, is reasonably fit and safe for the purposes for which it was intended to be used.[78] "[U]nseaworthiness is a condition, and how that condition came into being - whether by negligence or otherwise - is quite irrelevant to the owner's liability for personal injuries resulting from it."[79]

Unseaworthiness is not a fault-based standard; however, a plaintiff must show that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[80]

A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper.[81] A vessel is also unseaworthy when an unsafe method of work

---

[77]*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 548-49 (1960).

[78]Boudreaux v. United States of America, 280 F.3d 461, 468 (5th Cir. 2002) (citation omitted); Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 339 (1955)("The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service.").

[79]*Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498 (1971).

[80]*Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992).

[81]*Usner*, 400 U.S. 494 at 499; see also *Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied* 429 U.S. 1121 (1977).

is used to perform vessel services.[82]   "An isolated personal negligent act of the crew" is not enough to render a ship unseaworthy.[83]   Rather, there should be evidence of "a congeries of acts."[84]

Here, Mr. Tisdale has shown with documents and testimony that the unseaworthy condition caused his injury.  The 100+ pound lock line hung above a two-foot wide wet deck, a cavel,  and open water.  It's position required him to lift 30 pounds (or more) above Marquette's corporate policy weight lifting limit from a height above  Marquette's corporate policy height lifting limit of 60 inches.  These factors "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[85]

Considering the facts and circumstances surrounding this accident, it is clear that Marquette breached its duty to provide Mr. Tisdale with a reasonably safe place to work. Marquette should have known of the dangers presented by the weight ans awkward position of the lock line.[86]   The unseaworthy conditions played a substantial part in bringing about or causing Mr. Tisdale's injury, and Mr. Tisdale's injury was a reasonably probable consequence of the unseaworthiness of the MTC-1363.

---

[82]*Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972).

[83]*Daughdrill v. Ocean Drilling & Exploration Co*., 709 F. Supp. 710, 712 (E.D. La. 1989).

[84]Id., quoting *Robinson v. Showa Kaiun K.K.*, 451 F.2d 688, 690 (5th Cir. 1971)).

[85]*Underwood* at p. 20; *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992).

[86]*Phillps,* 953 F.2d at 928; *Underwood,* 2021 WL 3077367, at pp. 5-7.

## V.  CONCLUSION

The specific circumstances that presented themselves to Mr. Tisdale were unique.  He had never before been ordered to lift and carry a 100+ pound water-soaked line hanging at shoulder height, which was beyond Marquette's lifting maximums, in the pouring rain on a two-foot wide ledge with a caval underfoot and open waters at his back.  A safe window of opportunity to carry this line to the bow of the MTC-1363 was allowed to pass.  No safe alternative presented itself to Mr. Tisdale.  Marquette's negligence and the unseaworthy condition caused Mr. Tisdale's injury.

Seen in a light most favorable to Mr. Tisdale, there are genuine issues of material fact which require denial of Marquette's motion for summary judgment.

Respectfully submitted,

*/s/ Richard M. Martin, Jr.*
Richard M. Martin, Jr., T.A., La. #8998
Lamothe Law Firm, LLC
400 Poydras Street, Suite 1760
New Orleans, LA 70130
(504) 704-1414
rmartin@lamothefirm.com

*/s/ Joseph A. LoCoco*
Joseph A. Lococo, La. #17351
Virginia L. LoCoco, La. #18307
LoCoco & LoCoco, PLLC
Post Office Box 6014
10243 Central Avenue
D'Iberville, MS 39540
joseph.lococo@lococolaw.com
virginia.lococo@lococolaw.com

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has this day been forwarded to the following counsel of record to this proceeding by electronic transmission, facsimile and/or by depositing same in the United States Postal Service, properly addressed and postage prepaid, this 22nd day of August, 2023.

*/s/ Richard M. Martin, Jr.*
Richard M. Martin, Jr.
